Joseph W. MARTI, Jr., et al., Plaintiffs,

v.

GREY EAGLE DISTRIBUTORS, INC., Defendant.

No. 4:92CV798SNL.

United States District Court, E.D. Missouri, Eastern Division.

Aug. 6, 1996.

Arthur G. Muegler, Jr., St. Louis, MO, for plaintiffs.

John B. Renick, St. Louis, MO, for defendant.

## MEMORANDUM OPINION

LIMBAUGH, District Judge.

Plaintiffs have brought this action alleging that the defendant has violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* (as amended) by failing to compensate them for hours worked in excess of forty (40) hours per week as night loaders. They further allege that the defendant has retaliated against them for filing this lawsuit by engaging in acts of harassment and failing to hire two of the plaintiffs as regular full-time night loaders. Count I alleges violation of the overtime provisions of the FLSA, 29 U.S.C. § 207(a)(1); Count III alleges retaliation, commencing on or about May 1, 1992, in violation of the FLSA.[1] Counts I and III were tried before this Court sitting without a jury from May 1, 1995 through May 5, 1995.

Before commencing with the Court's factual and legal findings, certain preliminary matters must first be addressed. Taken with the case are the plaintiffs' motions to amend second amended complaint (# 173) and to vacate the Court's order of February 2, 1995 (# 178). Having carefully considered these motions, the Court will deny same.

Another issue taken with the case was the status of Raymond Marti III. Mr. Marti had originally been a plaintiff in all three counts of the Second Amended Complaint. On July 2, 1993 Marti III dismissed his claim under Count I. On October 7, 1993 this Court dismissed Count II as to all plaintiffs (as accounted for at the time of the Court's order). The Court had assumed that Marti III was no longer a plaintiff to this lawsuit, under Count III, since Count III references only the plaintiffs pursuant to Counts I and II. However, at trial, plaintiffs' counsel insisted that it was never contemplated that Marti III could not pursue his claim of retaliation under Count III. Without deciding the matter, the Court allowed Mr. Marti III to testify regarding his claim, especially with regard to his claim of denial of full-time employment in retaliation for filing this lawsuit. Although defendant does not concede that Marti III has standing to pursue his retaliation claim, it does seek a determination on the merits of the claim since it has been fully litigated. Under the circumstances, the Court determines that Raymond Marti III has standing, pursuant to Count III, to pursue his claim of retaliation. The Court will treat Marti III as a proper plaintiff in this cause of action as to Count III only.

Consequently, the Court determines that the following persons were proper plaintiffs in this cause of action at the time of trial: Mike Abernathy, Mike Alsop, Rick A. Atchley, Chris Cannon, John J. Caswell, Paul Diecker, Patrick Dougherty, Robert Edmond, David First, Joe Gaeta, Fred Hodges, Jr., Jerry Holloway, Martin Hooper, Mike Jablonowski, Milton Jones, Barry McClintock, Greg McDonald, Joseph W. Marti, Jr., Raymond Marti, III. (Count III only), Henry Meyers, Nick Millich, Keith Moorehead, Daniel Murphy, Steve Nelson, Ray Powers, James Swift, and Maury Weiner.

---

1. Count II of plaintiff's Second Amended Complaint has been previously dismissed by this Court.

Finally, after careful consideration, the defendant's objections taken with the case to the following exhibits are sustained: Plaintiffs' Exhibits 46, 69, 70 and 80. Furthermore, the defendant's objections to the introduction of its answers to plaintiffs' Second Interrogatories/Production Request No. 6 (regarding meal period) is sustained. All other objections to exhibits that were taken with the case are now overruled, and are now received into evidence.

This Court, having now considered the pleadings, the testimony of witnesses, the depositions testimony, the documents in evidence and the stipulation of uncontested facts filed by the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Defendant Grey Eagle Distributors (Grey Eagle) is a distributor of primarily Anheuser–Busch products, both beer and juice [2] products. It has approximately 1600 retail customers throughout St. Louis County.[3] Plaintiffs have worked at Grey Eagle, during the relevant time-period, as night loaders. Each plaintiff's employment by Grey Eagle, during the relevant time-period, was subject to the terms of a collective bargaining agreement (CBA) by and between defendant Grey Eagle and Brewery Drivers & Helpers, Local Union # 133 (Union). Since 1988, the CBAs negotiated between the defendant and the Union have included a specific pay plan (for the night loaders) commonly referred to as the Eleven Hours Pay Plan. Defendant's Exhibits A, B, and C. Under the Eleven Hours Pay Plan, night loaders at Grey Eagle

are paid eight (8) hours at their regular rate and three (3) hours at time and one-half their regular rate on any given typical work night. Prior to May 1991, work performed on Sunday night was paid at double time rates; however, since May 1991, Sunday night work has been paid at time and one-half plaintiffs' hourly rate. This eleven hours of pay is guaranteed whether the night loader actually works eleven hours. Prior to the 1988 CBA, defendant had expressed concerns regarding safety and its belief that the night loaders were artificially inflating their pay by working more hours than necessary.[4] In 1988, the Union offered the Eleven Hours Pay Plan to Grey Eagle in exchange for a guarantee of a minimum night crew of nine (9) men and five (5) trucks loaded minimum (additional trucks loaded constituted bonus pay). In theory and practice, the pay plan would even out workhours; i.e. balance slow periods of less than eleven hours with high volume periods of more than eleven hours. A similar pay system had been successful with Lohrs Distributors. Neil Komadoski, defendant's Customer Service Manager, and Gary Scott, a principal officer of the Union, were intimately involved in the negotiations of the 1988 CBA, as well as the subsequent CBAs.

Night loaders' duties generally consist of three (3) functions: make-up (loading an order onto pallets), spotting (moving a loaded truck out of the warehouse), and loading. Night loading is a "bid" job; i.e. Union members must specifically seek the job and are usually awarded it based upon seniority and experience. "Seniority" is considered to be industry or union seniority, not seniority with Grey Eagle. If not enough men [5] bid on a night loading job or extra men were needed due to high volume of work, then the Union

---

**2.** The term "juice" is a generic term used in the industry referring to any non-beer product.

**3.** Throughout the trial there was constant reference to another distributor, Lohrs Distributors. Lohrs distributes primarily Anheuser–Busch products (beer and juice) throughout St. Louis City. Many of the plaintiffs, as members of Teamsters Local 133, have worked at both Grey Eagle and Lohrs since Teamsters Local 133 has negotiated collective bargaining agreements with both distributors.

**4.** Prior to 1988 night loaders were paid an hourly wage and any additional hours over the initial eight (8) hours were paid at an overtime rate.

**5.** For simplicity sake, the Court will refer to the night loaders in the masculine form since all of the plaintiffs in this case are male and all the testimony as to persons working as night loaders (whether plaintiffs or others) appeared to regard these individuals as male. This is not to say that a woman could not be a night loader or that no women worked as night loaders during the relevant time-period.

would send out men as "casuals". Some men chose to work exclusively at Grey Eagle either full-time or as a casual; other men would simply work at any one of the distributors depending on the need.

Night loaders generally work Sunday through Thursday nights. Night loaders clock in when they report to work and they clock out when their work is completed.[6] They do not "clock out and clock in" for their meal period and their breaks. On a typical night, night loaders have the following schedule: two (2) hours work, a thirty (30) minute break, one and one/half hours (1½) work, a one (1) hour meal period, another two (2) hours work, and another thirty (30) minute break. Every two (2) hours thereafter, night loaders receive another thirty (30) minute break. During their breaks, the night loaders are restricted to the defendant's premises, but they have unrestricted access to a breakroom which is equipped with furniture, television, microwave, telephone, and a cooler. During the relevant time-period plaintiffs were and are free to eat, sleep, read, watch television, make phone calls, play cards, etc. as they desired. The Wage and Hour Reports marked as Plaintiffs' Exhibits 4–13, 19, 19A–E, 20, 20A–U; and Defendant's Exhibits J–DD, OO–UU reflect the hours shown on the respective plaintiffs' time cards while clocking in and clocking out during the relevant time-period and reflect the amounts and basis of pay for these hours.

Other than the requirements set forth in the CBAs, plaintiffs and defendant are subject to the requirements and regulations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207 *et. seq.*

As stated before, the Eleven Hours Pay Plan was initiated pursuant to the 1988 CBA (March 1, 1988 through February 29, 1991). Following the ratification of this CBA, the night workers began to express dissatisfaction with the pay system. Defendant believed that this dissatisfaction began to nega-

tively impact upon the men's productivity. Although there had always been supervisors on duty at night, they did not actively involve themselves with the monitoring of assignments and work performed. However, starting in 1990 defendant believed that the night loaders were actively engaging in a "work slowdown" to express their dissatisfaction with the Eleven Hours Pay Plan and to artificially increase their work hours, thus, artificially inflating their pay.

In the spring of 1991, Mike Jablonowski, one of the night loaders, complained to the Wage and Hour Division (of the Department of Labor) about being denied compensation "for all hours worked". He contended that defendant was erroneously failing to include in the computation of eleven hours "worked" time spent for the meal period and for breaks. The Wage and Hour Division investigated the complaint. Defendant provided the officials of the Wage and Hour Division the relevant pay records and an explanation for its pay practices. The matter was concluded with no legal action by the Department of Labor being taken against the defendant. The Union also investigated the complaint and never filed any formal action against the defendant.

In October 1991, Tom Bannes was one of the night supervisors. He was specifically assigned to monitor the night loaders' work performance. The night loaders' work hours had significantly increased from the previous year although there were more night loaders on the job, fewer trucks being loaded, but approximately the same number of cases of beer and juice products loaded. Defendant's Exhibit EE.[7] Defendant had Bannes change the manner of assigning work to the night loaders. Previously, distribution of the loading tickets had been left to the men to work out among themselves. Defendant believed that a substantial amount of time was taken up by the men in performing this task so Bannes was put in charge of handing out the

---

**6.** The night loaders do not work a "regularly scheduled" night; i.e. the men will report to work and finish their assignments at various times.

**7.** Exhibit EE is a summation of the years 1990–1994 on a monthly basis. Defendant's Exhibits

D–I are the foundation for this exhibit. Exhibit EE show, for example, that in September 1990 412,149 cases were loaded onto 1073 trucks by 208 night loaders in 11.5 hours; however, in September 1991, 416,086 cases were loaded onto 945 trucks by 218 night loaders in 13.4 hours.

load tickets one at a time. When a night loader had completed his work assignment he was required to return the load ticket to Bannes in order to receive his next work assignment. Bannes remained on the floor and closely monitored the night workers' job performance. Night loaders were to keep the supervisor informed of their whereabouts if they were leaving the work area, even to use the bathroom.[8] Bannes reported frequently to Neil Komadoski regarding the night loading operation. He ultimately concluded and reported to Komadoski that, in his opinion, the night loading crew was "slacking off". He felt that the night loading crew was actively resisting the changes that defendant was attempting to implement.

Another measure implemented was a "call-in" procedure whereby the members of the night loading crew would call the defendant between 3:00 and 5:00 p.m. on Friday to get the work schedule for the following week.

During the 1990–1991 time-period Gary Scott, in response to Komadoski's suspicions about an intentional work slowdown, went to defendant's warehouse to observe the night crew at work. He made suggestions, such as separate crews being created for loading package beer and juice products, as well as for loading the draft beer. These were contemplated and instituted by defendant. Defendant's Exhibit FF.

Things did not improve in 1992. Although the number of cases loaded remained relatively constant and the number of trucks loaded decreased, the hours kept increasing despite an increase in the number of loaders. Defendant's Exhibit EE. Defendant kept its night supervisors on the floor closely monitoring the night loaders. The gates were locked during breaks preventing the night loading crew from leaving the premises.

There were times when not enough men bid on the night loading jobs. Defendant's Exhibit HH. Meanwhile, members of the night loading crew were filing numerous grievances. See, Plaintiffs' Exhibits 21 and 22.

On April 27, 1992 several of the members of the night loading crew filed the instant lawsuit.[9] The night loading crew (now several of them being plaintiffs in this case) continued to file grievances over a variety of perceived wrongs. The work hours continued to increase despite less beer and fewer trucks being loaded. Komadoski wrote Gary Scott about the problems with the night loading crew. Defendant's Exhibit II. Scott responded to Komadoski's letter. Defendant's Exhibit JJ. Although he admitted that the Union also suspected a "slowdown" was being perpetrated by several of the plaintiffs in this case, he steadfastly insisted that another factor affecting loading time was the increase in the package mix. He also suggested that defendant consider hiring experienced night loaders from the "Extra Board"[10]; many of these men were from the defunct St. Louis Beer Sales Co.[11]

In June 1992 the Friday call-in procedure was reemphasized to the night crew by a written memorandum. Plaintiffs' Exhibit 64. The memorandum listed numerous night loaders to whom the memorandum was applicable—plaintiffs and non-plaintiffs. In the early part of July 1992 defendant issued numerous letters of reprimand to the members of the night loading crew, several of whom were plaintiffs in this cause of action. Defendant's Exhibits KK. After a series of written communications between Scott and Komadoski the reprimands were withdrawn. The Union insisted that there was no set "standard time" for loading a truck.

8. This did not include the meal period.

9. As the court file reflects, the number and identities of the plaintiffs to this lawsuit changed several times by the time the case was tried before the Court. At the time of trial, it was still unclear as to who exactly were the plaintiffs. The Court had a list drawn up and during the pretrial conference confirmed with counsel the status of the plaintiffs.

10. The "Extra Board" is a listing provided by the Union of Local 133 members qualified for certain full-time positions.

11. Throughout the litigation of this case (both in documentation and trial testimony) men who had formerly worked at St. Louis Beer Sales Co. have been consistently referred to as "Stag drivers or night loaders". This term will also be used in this memorandum opinion to refer to the men ultimately hired in November 1992 by defendant.

In the latter part of July 1992 defendant hired two full-time night loaders, one of whom had been a plaintiff to this cause of action—Keith Lombardo. Lombardo had been a casual working for defendant since 1988. He had had conversations with Komadoski regarding full-time employment. Komadoski regarded him as a productive worker and was unaware of any complaints regarding Lombardo's work habits. Lombardo had considered becoming a plaintiff to this lawsuit but had decided that many of the issues involved did not pertain to him and that he really could not afford the $400.00 retainer to plaintiffs' counsel. On July 10 he informed plaintiffs' counsel that he did not wish to participate in the instant lawsuit. On July 24, 1992 he was hired full-time by defendant. At the time of his hiring Lombardo was not an initiated member of Local 133 (although he had been routinely hired out of the Union hall as a casual for several years). On July 29, 1992 Lombardo sent plaintiffs' counsel a formal written letter withdrawing his participation from the instant lawsuit. Plaintiffs' Exhibit 66.

In November 1992 defendant decided to hire several men as full-time night loaders. Gary Scott suggested to Komadoski that he consider the Stag drivers as these new night loaders since they were out of work. The Union submitted a list of men for defendant to consider hiring. Komadoski interviewed the men on this list plus several others. One of the men interviewed was plaintiff Daniel Murphy. Six men were hired: five (5) of the Stag drivers on the Union's list and another individual. Murphy was not hired as a full-time night loader.

In addition to hiring additional full-time night loaders, defendant also, pursuant to the Union's suggestion, assigned night loaders to three (3) 3-men crews to load package beer and juice products, and one (1) 3-men crew to load draught beer. Every week, the draught beer assignment rotated to a different crew. The crews generally consisted of an "all-plaintiffs crew", "all-Stag" crews, and/or "mixed" crews. Work assignments for the package crews were made by Ed Show who had succeeded Tom Bannes as a night supervisor. Show gave each package crew a set of tickets at the beginning of the shift for all the trucks to be loaded that night. He rotated truck assignments per crew in order to coordinate a balance on a weekly basis. He performed a weekly review as to the number of trucks loaded per crew and the types of trucks loaded per crew. He observed that the crew that routinely finished behind the other crews was the "all-plaintiffs" crew consisting of plaintiffs Alsop, McDonald, and Powers/or Holloway. During the relevant time-period another night supervisor, Howard Storie, also monitored the night loading crews. He also observed that the crew consisting of Alsop, McDonald, and Powers/or Holloway generally finished their assignments last; while the crews that consisted of the Stag drivers consistently finished their assignments first. Plaintiff Powers filed a grievance claiming unequal distribution of the load tickets; i.e. that the Stag crews were given the "easy" jobs while the plaintiffs crew was given the "hard" jobs. The Union investigated the claim, reviewed the load tickets, and found no merit to the grievance.

After the new men were hired in November 1992 the average monthly work hours began to decrease. Defendant's Exhibit EE. Although there were generally fewer hours, there were more trucks, and more cases of increased product mix loaded. This decrease in average monthly work hours remained constant until June 1994, following the ratification of the 1994 CBA. At that time the Stag men were able to bid out of the night loading jobs, whereas several of the plaintiffs bid back onto the night loading jobs. In August 1994, in accordance with the 1994 CBA, the draught crew was reduced to a 2-men crew. Plaintiff Hooper filed a grievance which the Union rejected as meritless.

This lawsuit was scheduled several times for trial in 1994 and was eventually tried before the Court in May 1995.

## CONCLUSIONS OF LAW

### COUNT I

Plaintiffs contend that, during the relevant time-period, they routinely worked seventy (70) to eighty-five (85) hours per week for

which they were not compensated in accordance with the provisions of the FLSA. Defendant contends that although the plaintiffs' time card hours show each night a plaintiff worked as a night loader from the time he clocked in to the time he clocked out, not all hours shown are compensable. The Court has already ruled that the one (1) meal period included on each plaintiff's time card is not compensable work time. Defendant argues that each break period of thirty (30) minutes included on each plaintiff's time card is also not compensable work time. Thus, deducting from each plaintiff's time card the non-compensable hours for the meal period and breaks, reveals that each plaintiff was actually paid not only for his actual work hours, but in some cases, was paid for more hours than actually worked.

That portion of the FLSA regarding overtime compensation requires payment at not less than one and one-half (1½) times an employee's regular rate for all hours worked in excess of forty (40) hours per week. 29 U.S.C. § 207(a)(1). Extra compensation, as provided for in a collective bargaining agreement, is not included in the regular rate and should be credited toward any weekly overtime compensation due. 29 U.S.C. § 207(e) and (h). Under the Eleven Hour Pay Plan, each plaintiff is entitled, each night worked, to eleven (11) hours pay, three (3) of which are at time and one-half (1½) the regular pay rate. The issue before the Court is whether each plaintiff has proven that he actually worked in excess of forty (40) hours per week for which he was paid less than his regular rate of pay for the first forty (40) hours and less than time and one-half (1½) the regular rate of pay for hours actually worked in excess of forty (40).

As previously held by this Court, the plaintiffs' meal periods are not compensable work time; thus, the number of hours shown on each plaintiff's time card must be reduced by the one (1) hour meal periods. The Secretary of Labor's regulations regarding breaks provides some guidance as to whether or not breaks are compensable. The Secretary of Labor has recognized that breaks of short duration, five (5) to twenty (20) minutes, are generally viewed as "rest periods" and are compensable. 29 C.F.R. § 785.18. However, breaks of longer duration "during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked" and thus, not compensable work time. 29 C.F.R. § 785.16. As previously noted in the Court's February 2, 1995 order on the issue of compensability of meal periods, the Eighth Circuit held that the "predominantly for the benefit of the employer" standard is the recognized test for determining compensability of meal periods. Court Order, filed February 2, 1996 *citing Henson v. Pulaski County Sheriff Dept.,* 6 F.3d 531, 534 (8th Cir.1993). This Court further found that this same standard was applicable to the issue of compensability of break periods.

■ Plaintiffs argue that their thirty (30) minute breaks are "rest periods" which benefit defendant because the plaintiffs return to work rejuvenated and more productive. They further argue that during the breaks they were "on-call" and available for work. Defendant contends that the plaintiffs' break periods were not predominantly for the benefit of defendant because the plaintiffs were not "on-call" for work and were able to use the time freely for their own purposes, which included a number of activities besides "resting".

The plaintiffs who chose to testify all testified that they received regularly scheduled thirty (30) minute breaks, usually at least three (3) a night. They all testified that they were free to do as they pleased—sleep, eat, watch television, play cards, read, make phone calls, or go outside onto the parking lot. Plaintiff Powers used his breaks, during his night loading hours from October 1992 to January 1993, to review the loading tickets in order to find "evidence" of unequal distribution. Plaintiff Hooper testified that, despite using most of his breaks for sleeping, he was on-call for work; however, he was unable to cite a single instance when his break was interrupted to load or unload a truck. Plaintiff Alsop claimed that on at least two occasions he had to train an unidentified person; yet, defendant's night supervisors all testified that they never observed any one of the

plaintiffs use a break period for training another night loader. The only restriction upon the plaintiffs was that they could not leave the defendant's premises during the breaks.

The Department of Labor's regulations do not require that an employee be allowed off the employer's premises during a break period in order to exclude the time from hours worked. 29 C.F.R. § 785.16. All the regulations have required is that such break periods be "long enough to enable him [the employee] to use the time effectively for his own purposes" and "[w]hether the time is long enough to enable him to use the time effectively for his own purpose depends upon all of the facts and circumstances of the case." 29 C.F.R. § 785.16.

Most courts have considered the compensability of meal periods, but few have considered the issue with regard to breaks. Those that have considered the issue have found that breaks of at least thirty (30) minutes were not compensable, *Donovan v. Bel–Loc Diner*, 780 F.2d 1113 (4th Cir.1985); *Dole v. Haulaway, Inc.*, 723 F.Supp. 274 (D.N.J. 1989), *aff'd* 914 F.2d. 242 (2nd Cir.1990); *but see, Brock v. Claridge Hotel and Casino*, 664 F.Supp. 899 (D.N.J.1986), whereas breaks of 20 minutes or less were compensable, *Martin v. Waldbaum*, 1992 WL 314898 (E.D.N.Y. 1992).

■ As stated previously, in interpreting the Department of Labor's regulations, the Eighth Circuit applies the "predominantly for the benefit of the employer" test in order to determine compensability of an employee's time. Plaintiffs contend that their break periods are for the benefit of defendant because plaintiffs are "rejuvenated". The Court does not dispute that the plaintiffs' "rejuvenation" may be of some benefit to defendant; however, the effect of a break is not the focus of the test. The focus of the test is upon the plaintiffs' activities during their breaks and whether these activities are performed predominantly for the benefit of the defendant. The burden is on the plaintiffs to demonstrate that during their breaks their time or attention was devoted to work-related activities. Plaintiffs have failed to meet their burden.

The plaintiffs have failed to provide any credible evidence that they were "on-call" during their breaks. There was no evidence of the imposition of restrictions, other than remaining on the premises, on the plaintiffs during their breaks. They were not required to perform any affirmative work-related acts while allegedly on-call. There were no restrictions which prevented any one of the plaintiffs from indulging in leisure activities such as reading, watching television, playing cards, or eating. See, *Cross v. Arkansas Forestry Com'n*, 938 F.2d 912 (8th Cir.1991); *Darrah v. Missouri Highway and Transp. Com'n*, 885 F.Supp. 1307 (W.D.Mo.1995). They weren't required to do anything that could conceivably be considered "work-related". The Court finds that the plaintiffs were not "on-call" during their breaks.

The fact that the plaintiffs were restricted to the premises during the breaks does not make a sufficient showing that their breaks were predominantly for the benefit of the defendant. What small benefit plaintiffs' "rejuvenation" may have had for the defendant is greatly offset by the fact that the plaintiffs were free to enjoy a variety of recreations and amusements during their breaks. The credible evidence clearly shows that during the breaks plaintiffs regularly engaged in personal activities and did not engage in any work-related activities. None of the activities engaged in by the plaintiffs during their breaks were predominantly for the benefit of Grey Eagle.

The evidence at trial showed that a typical schedule was one (1) thirty (30) minute break after the first two (2) hours of the work shift, another one and one-half (1½) hours work shift, a one (1) hour meal period, another two (2) hours work shift, another thirty (30) minute break, and every two (2) hours thereafter, another thirty (30) minute break. Thus, during a typical twelve (12) hours night loading shift, a night loader would receive three (3) thirty (30) minute breaks and a one (1) hour meal period. Consequently, after deducting the time for breaks and the meal period, the night loader actually worked nine and one-half (9½) hours for which he would be paid a minimum of eleven (11) hours, three (3) of which would be at time and one-

half the regular pay rate. In addition, depending upon the time-period involved, up to eight (8) hours on Sundays would have been paid at double time or time and one-half, and if the crew loaded more than five (5) trucks per man on any given night, bonus compensation would be paid at the time and one-half rate.

Having found that the meal period and the break periods are not compensable, a review of the plaintiffs' time and payroll records shows that there is no unpaid overtime liability to any one of the plaintiffs. In fact, it is this Court's considered opinion, that after deducting the meal periods and break periods during most of the plaintiffs' work weeks, plaintiffs were often paid for more hours than they actually worked. Clearly, the plaintiffs demonstrated their dislike for the Eleven Hours Pay Plan; however, after reviewing their time and payroll records, more often than not plaintiffs greatly (financially) benefitted under the plan.

### COUNT III

#### A. Hiring Claims

■ Two of the plaintiffs, Daniel Murphy and Ray Marti III, specifically claim that they were not hired full-time by the defendant in retaliation for filing this lawsuit. After reviewing the credible evidence, including trial testimony, this Court finds that neither of these two plaintiffs were denied full-time employment in retaliation for filing this lawsuit.

Plaintiff Murphy did not testify on his own behalf at trial. However, the credible evidence shows that Murphy worked for the defendant as a night loader on a casual basis. In November 1992, Komadoski and Scott discussed the lack of men bidding on the night loading jobs. Scott suggested that defendant hire men full-time to work as night loaders for the remainder of the 1991 CBA period. Scott encouraged Komadoski to hire the Stag men because they were out of work and wanted to work. He submitted a list of men,

including a number of Stag men, from the Union roster to Komadoski to consider. Komadoski interviewed not only these men, but others including plaintiff Murphy. As a Union member, Murphy had more seniority than some interviewees, less than others. Komadoski was familiar with Murphy's job performance, and believed him to be less productive than others he was considering for the job. Ultimately, Komadoski hired six men full-time, the majority being the former Stag drivers. Scott had endorsed these men as good, experienced night loaders. Murphy was not one of the men hired full-time.

Komadoski testified that at the time he was hiring men full-time, he was not aware of Murphy's status as a plaintiff in this lawsuit. Murphy offered no evidence to rebut this testimony. Although it may be considered a plus in hiring for an employee to have had prior experience at Grey Eagle, there is no evidence that prior experience at Grey Eagle was a mandatory factor to consider. It is undisputed that the 1991 CBA did not require defendant to consider only men who had worked at Grey Eagle for full-time positions as night loaders. The Stag men had experience as night loaders and the Union had encouraged defendant to hire these men.

Furthermore, if Murphy's status as a plaintiff had been a significant factor in deciding not to hire him, it would seem that defendant would have hired Salvatore Orlando, a former plaintiff in this lawsuit. Mr. Orlando was another interviewee for a full-time position in November 1992. He had more seniority than Murphy. He withdrew from the lawsuit in July 1992 [12] and was endorsed by Gary Scott. However, he was rejected for full-time employment in November 1992.[13] Although Orlando's letter of October 29, 1992 (Plaintiffs' Exhibit 67) indicates that being a plaintiff in this lawsuit might affect his chances of being hired full-time, he testified that this was solely his own personal opinion and that no one, including Komadoski, had ever spoken to him about

---

**12.** Mr. Orlando testified that he verbally told the plaintiffs' counsel that he was withdrawing from the lawsuit in July 1992; however, in October 1992 he tendered a formal written withdrawal from the lawsuit to plaintiffs' counsel.

**13.** Mr. Orlando was hired full-time later in March 1993.

withdrawing from the lawsuit or indicated that not being a plaintiff would increase his chances of being hired full-time. Murphy has failed to meet his burden of establishing, by any credible evidence, that defendant refused to hire him full-time in retaliation for being a plaintiff in this lawsuit.

Plaintiff Marti III claims that he was not hired full-time in July 1992 in retaliation for bringing this lawsuit. As evidence of this retaliation, Marti III points to the hiring of Keith Lombardo. After considering the evidence at trial, and Marti III's testimony, the Court finds that Marti III has failed to meet his burden of establishing retaliation as regards full-time employment.[14]

Marti III had worked sporadically as a casual for the defendant for a number of years. From 1988 to 1990 he was suspended from working as a casual for defendant due to an incident in which he damaged a truck. In July 1992 he sought full-time employment with the defendant, as did Keith Lombardo. Lombardo had been a plaintiff in this lawsuit, but had withdrawn his participation in the lawsuit prior to being considered for full-time employment.[15] Although Lombardo, unlike Marti III, was not an initiated Union member in July 1992, his hiring was not aggrieved by the Union. He had experience as a night loader with defendant and was considered by Komadoski to be a productive worker; even plaintiff Hooper testified that Lombardo was a good night loader. The credible evidence showed that Lombardo was a productive night loader with experience with the defendant and that his hiring did not violate any provisions of the 1991 CBA or Union rules.

Marti III has failed to put forth any credible evidence showing that he was not hired full-time because he was a plaintiff in this lawsuit.

### B. Other retaliation claims

 Plaintiffs continually attempted to interject into this lawsuit alleged acts by the defendant prior to April 27, 1992. Plaintiffs' Second Amended Complaint unequivocally alleges retaliation due to the filing of this lawsuit. Since the lawsuit was filed on April 27, 1992 any evidence of retaliation occurring prior to April 27, 1992 is irrelevant and rejected for consideration by this Court.

The Court also notes that essential to the plaintiffs' claims of retaliation is awareness by the defendant (i.e. defendant's management or supervisory personnel) of the identities of the plaintiffs to this lawsuit. The record clearly shows that prior to trial of this matter the identities and status of the numerous plaintiffs kept changing. At one point the Court had to direct plaintiffs' counsel to clearly identify his clients in order for defendant to adequately conduct discovery. Even at time of trial, the Court had to confer with counsel in order to have an accurate accounting, for the trial record, of the plaintiffs to this action. Even the plaintiffs who testified were unable to identify their co-plaintiffs either during the time of the alleged retaliatory acts or even as of the trial date. Furthermore, these same testifying plaintiffs admitted that they had no credible evidence showing that any one of the supervisory personnel knew, for a fact, who the

---

14. Marti III also claims retaliation for a suspension he received in May 1992 for delivering beer to a delinquent account. At trial Marti III testified that he had delivered the beer on credit to a delinquent account but that an unidentified person (on behalf of the defendant) had authorized the transaction. Although Marti III could not identify the person who had authorized the transaction nor did he write down the authorization number for the transaction, he testified to a specific conversation with Komadoski in which Komadoski told him he was suspended. He denied ever stating that it was the Union that had actually informed him of the suspension. When confronted with his clear deposition testimony (which contradicted his trial testimony) Marti III recanted his trial testimony and admitted that no such conversation had ever taken place with

Komadoski. As will be discussed later, the Court finds Marti III's testimony lacking credibility and fails to meet his burden of proof as to his claim regarding the May 1992 suspension.

15. Lombardo testified that he first told plaintiffs' counsel that he wanted to withdraw from the lawsuit on July 10, 1992. He followed up on this oral communication by tendering a formal letter withdrawing from the lawsuit on July 29, 1992. He testified that no one, including Komadoski, had pressured him into withdrawing from the lawsuit or writing the letter. He did testify that he may have said differently to some of the plaintiffs but only did so because they were harassing him about being a "company man".

plaintiffs were at any given time. Defendant's supervisory personnel testified that they did not know who the specific plaintiffs were nor were ever given any instructions to carry out any act against any specific plaintiff. Given that the plaintiffs have offered no substantive evidence that defendant's management personnel actually knew who the plaintiffs were during the relevant time-period, the Court would be hard-pressed to find that the defendant engaged in retaliatory acts specifically directed towards unidentified plaintiffs. On this basis alone, the Court could and should find that defendant did not engage in any retaliatory acts and that Count III fails.

■ Forgetting for the moment the issue of knowledge (as to the plaintiffs' identities), the Court finds that the plaintiffs have failed to meet their burden establishing that defendant carried out any of the alleged retaliatory acts as a direct result of the filing of this lawsuit. The plaintiffs' allegations fall into essentially seven claims: increased supervision; new rules such as the "bathroom rule"; restricting or "locking in" the plaintiffs during breaks; the Friday afternoon call-in procedure; the warehouse being kept at frigid temperatures; and the hiring of the former Stag drivers full-time in November 1992.

The credible evidence demonstrated that the increased supervision began with Tom Bannes spending more time on the warehouse floor in October 1991. Upper management had been concerned about increasing hours for the night crew to complete their work despite more loaders, fewer trucks, and approximately the same number of cases being loaded as the previous year. Bannes reported that, after observing the night crew at work, it was his opinion that the night crew was "slacking off". While attempting to address the problem with the Union, defendant altered the way load tickets were distributed in order to track the work being done. Supervisors Storie and Show made-up the routes and distributed the tickets. In

prior years the night crew distributed all the tickets at once among themselves. However, defendant believed that this took up too much time and prevented it from monitoring the work being done. Although the plaintiffs grumbled that the tickets were unequally distributed, they produced no evidence supporting this allegation. The Union received only one (1) complaint about the load tickets, and after investigating the situation, found the complaint meritless. The plaintiffs' desire to maintain the status quo which gave them control of the situation cannot outweigh their employer's desire and need to monitor its own work environment. Defendant had suspected unproductive use of company time by the night loading crew long before the lawsuit was filed and had begun to implement procedures intended to increase supervision prior to the filing of this lawsuit. No retaliation was proven by the plaintiffs.

Along with the increased supervision, certain rules were implemented in order to monitor the night loaders' use of their work time. One of the rules complained of regards use of the bathroom. The night loaders were free to use the bathroom during their meal period and during their breaks. They never went more than two (2) hours without a break, and therefore, access to a bathroom. If any member of the night loading crew needed to use a bathroom during a work period, he simply had to inform the supervisor of his whereabouts. There was absolutely no evidence offered by the plaintiffs that any one, plaintiff or non-plaintiff, was ever denied use of a bathroom during a work period.[16]

As to the "lock-in", the credible evidence showed that defendant first engaged in a total lock-in (i.e. restricting employees to the warehouse during work hours) for a two-week period in 1990. After this period, the restrictions were eased and as of 1992, only the gates to the premises were locked during breaks. This restriction was agreed to by the Union. No one, including the plaintiffs,

---

**16.** The Court notes that another flaw in the plaintiffs' retaliation claims is that the acts complained of were directed towards the night loading crew as a whole. As the plaintiffs themselves testified, the night loading crew, at any given time subsequent to April 27, 1992 was composed of plaintiffs and non-plaintiffs. There was no credible evidence demonstrating any disparate treatment based upon the fact that some members of the night crew were plaintiffs, while others were non-plaintiffs.

could recall if the restriction was lifted following the hiring of the Stag drivers in November 1992.

Another procedure implemented initially prior to the filing of this lawsuit was the Friday afternoon call-in. It was first instituted in 1991 and agreed to by the Union. When it was reinstituted in 1992, defendant had been experiencing a shortage of manpower for the night crews. It was imperative for the defendant to know if it would have enough men to work the following week; otherwise, it had to seek casuals from the Union. Plaintiffs' Exhibit 64 listing the men who were required to call-in lists both plaintiffs and non-plaintiffs. Furthermore, the evidence shows that several of the plaintiffs who shortly thereafter became permanent night loaders had their names removed from the list.

Plaintiffs allege that the defendant intentionally kept the warehouse at frigid temperatures just to harass the plaintiffs. The undisputed evidence shows that Anheuser Busch dictated the temperature at which it wanted its products kept. Normally, Anheuser Busch mandated cooler temperatures for its products' storage. The warehouse temperature was controlled by a manual switch that operated air conditioners in the summer and fans to bring in outside air in the winter. The evidence showed that the "blowers" operated both day and night and that all persons in the warehouse were affected by the temperature. Plaintiffs claim that the temperature was kept so cold that the products regularly froze. Notwithstanding the absurdity of defendant jeopardizing its lucrative business arrangement with Anheuser Busch by freezing their products for the sole purpose of harassing the plaintiffs, there is no evidence of any complaints by Anheuser Busch regarding defendant's alleged acts of freezing its products. Nor is there any evidence of any incident report being generated concerning the instance of freezing complained of by plaintiff Jablonowski in January 1992.[17] In fact, plaintiff Jablonowski's only complaint to the Union (in fact the only

complaint ever filed by any of the plaintiffs in connection with the warehouse temperature) was his displeasure over being directed to move product out of a wet storage area. He felt that this was "not his job", that the day warehousemen should have moved the product and cleaned up the area. Plaintiffs' Exhibit 21.

Finally, as previously discussed, plaintiffs allege that the hiring of the Stag drivers was in retaliation for the filing of the lawsuit. The Stag drivers were experienced night loaders strongly endorsed for hiring by the Union. The hiring of the Stag drivers did not violate any provision of the CBA in effect at the time. The catalyst for hiring men full-time was that none of the regular night loaders, including many of the plaintiffs, were bidding on night loading work. The defendant hired men who were qualified, had seniority, and more importantly, wanted to work.

The Court finds that the plaintiffs have failed to put forth sufficient credible evidence showing that any of the acts allegedly carried out for retaliatory purposes were in fact carried out because the plaintiffs filed this lawsuit. Count III fails in its entirety.

Central to this lawsuit was the issue of whether the plaintiffs had purposefully carried out a "work slowdown" during the relevant time-period. Based upon the documentation and the testimony at trial, especially that of the plaintiffs, the Court finds that the plaintiffs did indeed engage in a "work slowdown" and whatever acts plaintiffs consider to be retaliatory were in fact a direct response to the plaintiffs' concerted effort to sabotage the defendant's business.

The Court found the plaintiffs' testimony to be wholly untrustworthy and lacking any credibility. Plaintiff Hooper spent his time secretly tape-recording private conversations with supervisory personnel and then denying it. He did not work as a night loader for twenty (20) months prior to August 1994 except for three (3) nights in January 1993

---

17. The Court notes that this alleged incident of the warehouse temperature being deliberately kept at freezing temperatures predates the filing of this lawsuit. However, the Court reviews this testimony only to reflect upon the plaintiffs' lack of credible evidence to support this claim of retaliation.

when he worked on a "mixed" crew; yet he attempted to testify (presumably based on personal knowledge) of numerous wrongdoings by the defendant. He complained of a reprimand he received for arriving at work twenty-five (25) minutes late; however, on cross-examination he admitted that the Union resolved the matter in his favor and he received eight (8) hours pay although he readily admits he did not work eight (8) hours. As previously noted, Hooper testified that he was "on-call" during his breaks, yet he could not recall one instance when he was called off his break to perform some work-related activity. Plaintiff Jablonowski complained to the Fair Wage Division about defendant's alleged non-compliance with the overtime pay provisions; yet the Fair Wage Division's investigation revealed no such non-compliance. He complained of being denied a transport (driver) job; yet later admitted that he was given the job one (1) month later. Interestingly, he claimed that he had more hours in 1992 than in 1991 because of more product mix being loaded, yet could not offer any explanation as to why the hours were less in 1993 and 1994 (after the Stag drivers were hired) given the fact that significantly more product mix existed and was being loaded than in 1992. McDonald's testimony consisted of accusing Ed Show of drinking on the job; yet, McDonald never reported it because "it wasn't my business to do so". He testified that the night loading crews were either "all-plaintiffs" or "all-non-plaintiffs"; yet, each of his testifying co-plaintiffs stated that the crews were generally one (1) all-plaintiff crew, two (2) mixed crews, and one (1) non-plaintiff crew. Finally, despite the fact that all of the testifying plaintiffs (including McDonald) admitted that assignments should have taken longer for the mixed crews or the non-plaintiff crews (i.e. the Stag crews) to complete because of lack of experience at Grey Eagle, McDonald's all-plaintiffs crew consistently finished last. Yet, he insisted that the other crews were given easier assignments even though there was no evidence to support this allegation. Mr. Hodge's testimony was an exercise in contradictions. He could not make up his mind as to what time-period he had bid on night loading work. He first testified that

he did not bid on night loading work after 1991; but when the Court commented upon the limitations period for the retaliation claims, Hodge's changed his testimony and claimed that he may have bid on night loading work after April 27, 1992. Plaintiff Powers spent his breaks scouring the load tickets attempting to find evidence of unequal distribution but failed to do so. He finally admitted at trial that on a weekly basis the different crews ended up loading the same types and numbers of trucks. Plaintiff Alsop was the only plaintiff to testify that the defendant's supervisors knew who the plaintiffs were during the relevant time-period (his fellow plaintiffs all testified that they had no personal knowledge or evidence that any of the defendant's supervisors ever knew or were told who the plaintiffs were in this litigation); yet, Alsop himself could not testify as to the identities of his co-plaintiffs. He claimed that the Friday afternoon call-in procedure first begun on June 30, 1992; however, evidence clearly showed that the call-in procedure had first been utilized in 1991 and had been instituted without objection by the Union. Alsop's credibility was completely shattered when he first denied any prior disciplinary problems with the defendant. However, when confronted with documentation of eight (8) separate incidents from 1984 through June 1994, he recanted his testimony and simply disavowed any responsibility for the incidents (i.e. the acts occurred but none of the incidents were his fault). Alsop's denials even extended to his refusal to admit that, at the time of the trial, his drivers' license had been suspended for driving while intoxicated and he had a prior conviction for driving while intoxicated. Finally, although he testified at trial that from 1989–1991 meal and break periods had been unsupervised and the meal period had always been at least one (1) hour, he admitted that he had told an investigator from the Labor Department that prior to November 1991 the meal period had only been twenty (20) to thirty (30) minutes and subject to restrictions.

As a final note, the Court feels compelled to comment upon the plaintiffs' trial tactics. Besides the evidence of plaintiffs' discovery abuse by engaging in underhanded tape-recordings of provoked confrontations with the

defendant's supervisors, the Court takes into consideration testimony regarding plaintiff Atchley's threats to physically harm one of the defendant's witnesses; and the plaintiffs' attempts to support their lawsuit by manufacturing evidence. Having already found that the plaintiffs engaged in suspect pretrial tactics in an attempt to avoid summary judgment on Count II of the Second Amended Complaint, the Court was not surprised by the evidence of similar tactics at trial.

The evidence clearly shows that beginning in late 1990 and throughout most of 1992 the plaintiffs' work hours increased; yet, the work hours began to decrease once several of the plaintiffs were replaced by the Stag drivers. The work hours did not begin to increase again until the Stag drivers left the night loading jobs and the plaintiffs bid back on the night loading jobs in 1994. Furthermore, the plaintiffs' explanation that their hours increased because there was more product mix in 1992 than in previous years fails because in 1993 and 1994 there was more product mix, more trucks loaded, little increase in manpower; yet, the work hours were less.[18] The Court is not inclined to allow the plaintiffs to benefit from such malfeasance.

Plaintiffs have failed to provide any evidence that the defendant failed, at any time, to comply with the provisions of the Eleven Hours Pay Plan as agreed to by the defendant and the Union. There is no evidence that any plaintiff, at any time, spent his break periods engaging in work-related activities predominantly for the benefit of Grey Eagle. Defendant properly adjusted the plaintiffs' weekly wages for the deduction of the meal periods and break periods. In most instances, even accounting for the deductions, plaintiffs' pay far exceeded the amount required by the FLSA overtime provisions. Plaintiffs have similarly failed to provide any credible evidence that defendant engaged in

any retaliatory acts due to the filing of this lawsuit. Given the circumstances of an intentional work slowdown, defendant was financially generous to the plaintiffs and amazingly tolerant of the plaintiffs' pettiness.

For the foregoing reasons, the Court enters judgment for defendant Grey Eagle and against the plaintiffs on the merits of Counts I and III of the plaintiffs' second amended complaint.

---

**18.** Actually the credible evidence showed that the product mix did not proportionately significantly increase by the introduction of more juice products. For example, by the Court's computations, in 1994 approximately 7,600,000 cases of product were loaded; yet, of this number, only 150,-000 cases constitutes juice products (approximately 2% of the total). The number of beer products increased more than the number of

juice products. Plaintiffs attempted to justify their increased hours on the basis of the increase in the number of juice products, asserting that juice products take longer to load (due to their packaging). However, the relatively small increase in juice products fails to realistically justify the large increase in hours during the 1991–1992 time-period.